# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | Case No. 22-01939-DSC7 |
| DEAN E. LEADER, | ) | |
|     Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |

| | | |
|---|---|---|
| CRESCENCIO PABLO, | ) | |
|     Plaintiff, | ) | A.P. No. 22-00049-DSC |
| vs. | ) | |
| | ) | |
| DEAN E. LEADER, | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION

This adversary proceeding concerns the dischargeability of a state court judgment against the Defendant, Dean Leader ("Leader"). The proceeding came before this Court for trial on October 18, 2023, and appearing at trial were William P. Traylor, Jason L. Yearout, Freddy Rubio, and Brenden Smith as counsel for Crescencio Pablo (the "Plaintiff"), and Ted Stuckenschneider as counsel for Leader.

The Court has jurisdiction to hear this matter under 28 U.S.C. § 1334 and the General Order of Reference entered and amended by the United States District Court for the Northern District of Alabama. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Consistent with the Trial Order of August 16, 2023 (doc. 26), neither party objected to the entry of final orders and judgment by the Bankruptcy Court. Based thereon, the parties are deemed to consent to the entry of final orders and judgment by this Court.

Based on the testimony, the exhibits, the filings, the arguments of counsel, and for the reasons set forth herein, the Court **FINDS** and **CONCLUDES** as follows:

## FINDINGS OF FACT

This adversary proceeding concerns a workplace accident that occurred at a plastics manufacturing facility in August 2017. The Plaintiff brought this suit on behalf of his wife, Catalina Estillado ("Estillado"), who tragically died in the accident. The Court is sensitive to the facts and the terrible loss suffered by the Plaintiff and his family. While this Court remains committed to the rule of law, the undersigned acknowledges that neither the Bankruptcy Code nor the Court's ruling can undo the tragic circumstances surrounding this case.

**ABC Polymer and the Machine**

ABC Polymer Industries, LLC ("ABC"), is a plastics manufacturing company that operates a facility in Helena, Alabama (the "Facility").

ABC operates multiple plastic extrusion "lines" at the Facility. In these lines, raw materials are molded into flat plastic sheets that are then pulled through a series of metal rollers before being cut into "threads," which are used to make plastic products. Clusters of metal rollers called "godets" are arranged at different points within each line to help pull sheets of plastic material through the production process.

The machine involved in the accident was located at Line 3, Godet 1. It consisted of three metal rollers, arranged in a triangular shape, with approximately 4.75 inches of space between each roller. The normal operational speed of Line 3 was approximately 70 to 90 linear feet of plastic sheet per minute.

Line 3, Godet 1, was equipped with a "cage" or barrier guard that could be pulled down to protect the machine operator from the high-speed rollers while the machine was in operation.

**Leader's Role at ABC**

Leader serves as Vice President of Operations at ABC. He has held this title for almost thirty years.

ABC hired Leader in 1994 to manage the installation and start-up of the machinery at the Facility. Leader also oversaw the Facility's safety program. Leader consulted a company called Safe State in 2008 to develop and implement a safety program and to create a "safety binder" with safety information for Facility employees. Additionally, Leader led the Facility's weekly safety meetings until approximately one year before the accident, at which point the Facility supervisors took over. In his role, Leader did not train individual employees on how to operate machinery except regarding forklift operation. He had not met Estillado before her untimely death.

**ABC's Safety Policy and Standard Practice**

At the time of the accident, ABC's "General Safety Rules and Regulations," dated January 1, 2008, stated as follows:

> Machine guards are installed as a means of protecting you from those parts of the equipment which could cause injury should you make contact while the equipment is in operation. For this reason, these guards must be left in place except when maintenance is being performed and then the guard may be removed only when the equipment controls are locked out by the person performing the maintenance.

Pl.'s Ex. 13 at 2. Notwithstanding this written policy, ABC had a standard practice of operating Line 3, Godet 1, with the barrier guard in the "up" position. Pl's Ex. 19 at ¶¶ 5-6. This would allow machine operators to reach between or near the moving rollers to cut "wraps" in the plastic sheets without stopping the production line. Pl.'s Ex. 19 at ¶¶ 5-6.

A "wrap" occurred when the plastic material being pulled through the machine was defective or broken and started to ball up or wrap around a roller. When a wrap got too big, it could jam the machine and affect the extrusion process.

3

Employees were instructed to raise the barrier guard and to cut the wraps with hand tools such as utility knives, box cutters, or scissors, while the rollers were moving at production speed. *See* Pl.'s Ex. 17. This practice resulted in several serious injuries to machine operators who came into contact with the moving rollers, including various cuts and the amputation of a machine operator's finger.

In his statement to the Occupational Safety and Health Administration ("OSHA") following the accident, Leader described keeping the barrier guards in the "up" position as a "really bad habit." Pl.'s Ex. 18 at 3:9-10. Leader was aware of the previous injuries and knew that cutting wraps while the machine was operating at production speed was dangerous. According to his testimony, Leader responded to these incidents by exploring ways to make the wrap-cutting process safer and increasing the frequency of safety meetings from one meeting per month to one meeting per week. He testified that during safety meetings, employees were encouraged to shut down the machines if they felt unsafe or uncomfortable while cutting wraps.

**Estillado's Employment with ABC and the Accident**

Estillado started working for ABC on or about April 25, 2017, as a machine operator. She was personally trained by Facility supervisor Luisa Mariel Miller. Pl.'s Ex. 19.

ABC assigned Estillado to work on Line 3, Godet 1, on August 16, 2017. While attempting to cut a wrap off one of the rollers, Estillado became entangled in the rollers and was tragically killed. There was no witness to the accident.

**State Court Action**

After the accident, the Plaintiff brought an action in the Circuit Court of Jefferson County, Alabama (the "State Court"), against ABC, Leader, William Durall, ABC's Director of Operations, and Faré S.p.A., the manufacturer of the machine. The Plaintiff sued under Ala. Code § 25-5-11(b),

4

Case 22-00049-DSC    Doc 33    Filed 11/27/23    Entered 11/27/23 13:24:06    Desc Main
Document    Page 4 of 14

which allows for recovery if "personal injury or death to any employee results from the willful conduct . . . of any officer, director, agent, or employee of the same employer." Ala. Code § 25-5-11(b). The "willful conduct" alleged in the State Court action was "the willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal." Ala. Code § 25-5-11(c)(2).

At the State Court trial, the Plaintiff introduced facts related to ABC's practice of raising barrier guards. The Plaintiff also introduced facts regarding the alleged removal of a "limit switch" from the machine. The limit switch was designed to activate when the barrier guard was raised and, once activated, would slow the machine rollers to reduce the risk of injury to the machine operators.

Later, during the Bankruptcy Court trial, Leader testified that the machine on Line 1, Godet 3, never had a limit switch since its installation at the Facility. He further testified that OSHA had never cited ABC for the lack of a limit switch on this machine.

The State Court found that Leader and William Durall effectively removed a safety guard by failing to install the machine's limit switch and by training employees to cut wraps by lifting and bypassing the barrier guard while the rollers were moving at production speed. Pl.'s Ex. 32. The State Court found, therefore, that Leader's conduct was "willful and intentional . . . with knowledge that injury or death would likely or probably result . . . " Pl.'s Ex. 32; Ala. Code § 25-5-11(c)(2). The court entered a judgment of $3,000,000 against ABC, Leader, William Durall, and Faré S.p.A. (the "State Court Judgment"). Pl.'s Ex. 32. The State Court Judgment is currently on appeal before the Alabama Supreme Court.

5

**Leader's Bankruptcy Case**

Leader filed a chapter 7 bankruptcy case on August 15, 2022, and listed the Plaintiff as a general unsecured creditor with a judgment claim of $3,000,000. *In re Leader*, No. 22-01939-DSC7 (Bankr. N.D. Ala.). The Plaintiff brought this adversary proceeding in response, alleging that the State Court Judgment is a nondischargeable debt for willful and malicious injury under Bankruptcy Code § 523(a)(6). Leader defends that the Plaintiff has failed to carry his burden because the evidence falls short of establishing that his actions were willful and malicious under § 523(a)(6). Def.'s Answer to Pl.'s Am. Compl. at ¶¶ 38, 41, 45.

## CONCLUSIONS OF LAW

Section 523(a)(6) of the Bankruptcy Code excepts from discharge a debt "for willful and malicious injury by the debtor to another entity . . ." 11 U.S.C. § 523(a)(6). While the Bankruptcy Code does not define "willful" or "malicious," the U.S. Supreme Court has held that § 523(a)(6) applies to "acts done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). In the language of § 523(a)(6), "'willful' modifies the word 'injury,' indicating that nondischargeability requires a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* (emphasis in original). The debtor must therefore "intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* at 61-62 (citing Restatement (Second) of Torts § 8A cmt. a (Am. Law Inst. 1964)). As such, § 523(a)(6) does not except from discharge debts arising from negligently or recklessly inflicted injuries. *Id.* at 59, 64.

The basis for the Plaintiff's claim of nondischargeability in this case is best summarized by combining several paragraphs of the amended complaint. The Plaintiff alleges that Leader willfully and maliciously injured Estillado by directly or indirectly training her to raise the barrier

6

guard to the "up" position and to cut plastic wraps by hand with a knife while the machine rollers were operating at production speed. Pl.'s Am. Compl. ¶¶ 31, 40, 43-44, 65-66, 68.

**Collateral Estoppel**

Although the Plaintiff has not argued that the State Court Judgment conclusively established that Leader's actions constituted a "willful and malicious injury," this Court nonetheless begins its analysis with a discussion of collateral estoppel.

A plaintiff can invoke collateral estoppel to establish that a debt is nondischargeable. *See Grogan v. Garner,* 498 U.S. 279, 284 n.11 (1991). The doctrine of collateral estoppel bars re-litigation of an issue if three requirements are met: (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment. *In re Halpern*, 810 F.2d 1061, 1064 (11th Cir. 1987).

The Plaintiff brought the State Court action under Ala. Code § 25-5-11(b), which allows for recovery if "personal injury or death to any employee results from the willful conduct . . . of any officer, director, agent, or employee of the same employer . . ." Ala. Code § 25-5-11(b). "Willful conduct" has four different definitions under the Alabama statute. The State Court determined that Leader's "willful conduct" was "the willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal . . ." Ala. Code § 25-5-11(c)(2).

The Alabama Supreme Court has stated that, in a cause of action brought under Ala. Code § 25-5-11(b) and based on the § 25-5-11(c)(2) definition of "willful conduct" (i.e., the removal of a safety guard), the plaintiff is not required to show any intent to injure. *See Bailey v. Hogg*, 547

7

Case 22-00049-DSC    Doc 33    Filed 11/27/23    Entered 11/27/23 13:24:06    Desc Main
Document    Page 7 of 14

So.2d 498, 499-500 (Ala. 1989). Rather, it is the willful or intentional removal of a safety guard or device, regardless of the intended result, that will incur liability under Section (c)(2). *Id.*

Further, in *Haisten v. Audubon Indem. Co.,* the Alabama Supreme Court rejected any requirement to show a purpose, intent, or design to injure in an action brought for the willful removal of a safety device. *Haisten v. Audubon Indem. Co.,* 642 So.2d 404, 407 (Ala. 1994). The court noted that an action based on willful conduct as defined under Ala. Code § 25-5-11(c)(2) "arguably allows recovery under a finding that a reasonable person had or should have had 'knowledge that injury or death would likely or probably result,' even if the defendant co-employee did not subjectively expect or intend to cause injury." *Id.*

Although the State Court concluded that Leader's actions constituted "willful conduct" under the Alabama Code, what constitutes a "willful and malicious injury" under the Bankruptcy Code is different. And it is different because there is no requirement under Alabama law for a plaintiff to show that the co-employee had an "intent to injure" in an action under § 25-5-11(c)(2) of the Alabama Code. Under the Bankruptcy Code, however, a willful injury is one of the elements a plaintiff must prove for nondischargeability under § 523(a)(6). Therefore, the "willful conduct" found by the State Court is different from the "willful" injury element required here. For this reason, a finding by the State Court that Estillado's death resulted from Leader's "willful conduct" does not afford a preclusive effect to the Plaintiff's claim of nondischargeability; therefore, this Court considers the Defendant's answer and evidence to independently analyze the facts and make its determination under the Bankruptcy Code.

8

Case 22-00049-DSC    Doc 33    Filed 11/27/23    Entered 11/27/23 13:24:06    Desc Main
Document    Page 8 of 14

**§ 523(a)(6) Analysis**

For the State Court Judgment to be excepted from Leader's chapter 7 discharge under 11 U.S.C. § 523(a)(6), the Plaintiff must show, by a preponderance of the evidence, that the alleged facts amount to a willful and malicious injury by Leader to Estillado. *Grogan*, 498 U.S. at 291.

The Eleventh Circuit treats the "willful" and "malicious" prongs of § 523(a)(6) as distinct elements that must be separately established. *In re Hamm*, No. 15-01826-TOM7, 2016 WL 3748796, at *4 (Bankr. N.D. Ala. July 7, 2016) (citing *Figueroa v. Barreto*, 514 B.R. 702, 714 n. 13 (Bankr. S.D. Fla. 2013)). Therefore, the Plaintiff must satisfy both the "willful" and the "malicious" prongs of § 523(a)(6). *Id.*

<u>Willful</u>

Proof of willfulness requires "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *In re Walker*, 48 F.3d 1161, 1163 (11th Cir. 1995) (quoting *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989)). Elaborating, the Eleventh Circuit has held that "[a] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury, or which is substantially certain to cause injury." *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *Walker*, 48 F.3d at 1165). Thus, to satisfy the "willful" prong of § 523(a)(6), the Plaintiff must prove by a preponderance of the evidence that Leader purposely injured Estillado or that, as a result of his intentional acts, her injury was substantially certain to occur.

There are two approaches for determining a substantial certainty of injury for the "willful" prong of § 523(a)(6). One is a subjective standard "requiring a creditor to prove that the debtor actually knew that the act was substantially certain to injure the creditor…" *In re Kane*, 755 F.3d 1285, 1293 (11th Cir. 2014). The other is "an objective standard requiring a creditor to show only

9

that a debtor's act was in fact substantially certain to cause injury." *Id.* Although the question of which standard governs is unanswered in the Eleventh Circuit, it is of no moment in this case because the evidence presented here falls short of proving a "substantial certainty of injury" under either standard. *Id.*

There is no evidence that Leader set out to injure Estillado intentionally and purposely, or to cause her death. The evidence showed that Leader had never met Estillado before the tragic loss of her life. The only question, therefore, is whether Estillado's death was substantially certain to occur given Leader's actions. And assessing willfulness is difficult when, as is the case here, there are no distinct acts alleged or proven at trial that directly implicate Leader as the cause of Estillado's fatal injuries. The allegations and testimony show a narrative of inaction, rather than action, by Leader in his safety and training roles at the Facility. Although Leader had knowledge of other injuries and dangerous practices, the Court is unpersuaded that Leader's conduct or knowledge amounted to intentional "acts" that were substantially certain to cause Estillado's death.

Turning to the evidence presented, the Court credits Leader's trial testimony to the extent it elucidates the nature of his position as Vice President of Operations and the realities of his work life. Leader's testimony substantiated that he was largely uninvolved with the plant floor on a day-to-day basis. His office was physically located elsewhere, so that the plant floor was out of sight if not also out of mind. A self-described "machine guy," he kept to his office working on machine prototypes and only talked to the maintenance manager on a daily or regular basis. He testified that he did not train employees on machines or practices except those regarding forklift operation, discrediting the notion that Estillado's injury was substantially certain to occur through his direct or indirect training. Indeed, the evidence established that Leader did not know how to cut wraps, no one reported to him, and he had no authority over any personnel. The Court finds this testimony

10

inconsistent with the Plaintiff's theory that Leader knew his actions were substantially certain to injure Estillado. And the evidence, as a whole, fails to establish that Estillado's injury and death were, in fact, substantially certain to occur.

As with training, Leader's involvement with safety measures at the Facility fails to establish willfulness. For several years, Leader conducted safety meetings at the plant. He testified that he would prepare an outline for the meetings and would discuss certain aspects of the "safety binder" at the meetings. He also testified that the meetings were intended to help reduce accidents and to provide a safer workplace. In conducting these meetings, Leader was certainly aware that accidents happened because employees were encouraged to discuss them; but extrapolating a substantial certainty of injury from this awareness is not justified by the evidence presented. Moreover, Leader testified that he was not in charge of enforcing safety rules; that responsibility was delegated to the Facility supervisors and plant managers. And, a year prior to Estillado's death, Leader was no longer conducting the safety meetings. That responsibility was also delegated to the Facility supervisors.

Not surprisingly, the Plaintiff points to Leader's OSHA statement about keeping the barrier guards in the "up" position as a "really bad habit" to show the substantial certainty of an injury occurring. Leader's statement was troubling, and, in hindsight, it was foreboding based on the horrific tragedy that took Estillado's life. Notwithstanding, the Court is unpersuaded that Leader's acknowledgement of a bad habit is enough to establish that he knew a fatal injury to Estillado was substantially certain to occur. As mentioned below, awareness of a risk of injury is not the same as a substantial certainty of injury, especially injuries as extreme as Estillado's.

During his testimony, Leader admitted that he was aware of the risk of injury to machine operators from cutting wraps while the rollers were moving at production speed. He was also aware

11

of the injuries that occurred at the Facility over the years, most of which were caused by cutting wraps. However, "the risk that injury could occur does not equate to an injury being 'substantially certain' to occur." *Hamm*, 2016 WL 3748796, at *4 (citing *Goldman v. City of Largo*, No. 8:08-cv-00333-JDW-TBM, 2009 WL 1651524, at *9 (M.D. Fla. June 10, 2009) ("[T]he knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent.")). Cutting wraps with the barrier guard in the "up" position and while the machine's rollers are moving at production speed "does not always result in injury to [a] person," and had never resulted in an employee's death at the Facility. *See Hamm*, 2016 WL 3748796, at *4 (finding that the creditor did not satisfy the "willful" prong where the debtor's intoxicated driving resulted in damage to the creditor's property despite the foreseeable risk of injury to person or property associated with intoxicated driving). Consequently, the Court is unpersuaded that the Plaintiff has proved by a preponderance of evidence that Estillado's death was substantially certain to result from Leader's actions or inactions as Vice President of Operations.

Malicious

As used in § 523(a)(6), "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Jennings*, 670 F.3d at 1334. For the purposes of § 523(a)(6), "malice can be implied." *Kane*, 755 F.3d at 1294. Implied or constructive malice can be found if the nature of the act itself implies a sufficient degree of malice." *Ikner*, 883 F.2d at 991.

An act is malicious if "the injurious consequences which followed the wrongful act were those which might naturally be expected to result from it, and which the defendant must be presumed to have had in mind when he committed the offense." *Tinker v. Colwell*, 193 U.S. 473,

12

486 (1904). "'Malice,' in law, simply means a depraved inclination on the part of a person to disregard the rights of others . . ." *Id.*

Here, the Plaintiff presented no evidence to suggest—much less prove by a preponderance—that Leader acted maliciously. And the nature of Leader's actions in this case does not imply "malefic intent." *See Ikner*, 883 F.2d at 991. Even if this Court were persuaded, which it is not, that Leader was responsible for developing and disseminating to machine operators the practice of raising barrier guards to cut wraps, or that he was indirectly involved in training at the time of the accident, Leader's alleged motive—to avoid shutting down the machines to reduce production costs—was not malicious by the standards this Court is required to employ. Simply put, the evidence does not bear out that Leader acted wrongfully or without just cause. Based on the trial testimony, the nature of Leader's actions does not contain a sufficient degree of malice, either actual or implied.

If anything, Leader's behavior falls within "the sort of reckless or unfortunate but non-malicious acts" that the Eleventh Circuit has "previously held does not rise to the standard of a willful and malicious injury under § 523(a)(6)." *See In re Monson*, 661 F. App'x 675, 685 (11th Cir. 2016) (citing *Walker*, 48 F.3d at 1163-65 (holding that the debtor's failure to obtain workers' compensation insurance, which created a debt after an employee suffered a workplace injury, was not a "willful and malicious injury" because "it cannot be said that [the employer] intended for [the employee] to suffer a fall or that there was an unbroken chain of events leading from [the employer's] intentional act to [the employee's] physical injury.")); *see also Ikner*, 883 F.2d at 987 (affirming the bankruptcy court's determination that a judgment in favor of the plaintiffs after an automobile accident was dischargeable because the creditors "did not prove by inference or innuendo that [the defendant] intended to cause the accident or resulting injury"); *see also*

*Kawaauhau*, 523 U.S. at 61-64 (holding that a medical malpractice judgment attributable to a doctor's negligent or reckless conduct did not constitute a "willful and malicious injury").

Although this Court views the former ABC practice of cutting wraps at production speed as grossly negligent or perhaps reckless, "an act in reckless disregard of the rights of others is insufficient to constitute 'willful and malicious' conduct for purposes of § 523(a)(6)." *Walker*, 48 F. 3d at 1165.

**Conclusion**

This Court concludes that the Plaintiff has not met his burden of proving that Leader caused Estillado's death by willful and malicious injury under 11 U.S.C. § 523(a)(6). Leader had no intent to injure Estillado, his actions were not substantially certain to result in Estillado's death, and he did not act with malice. The State Court Judgment against Leader is hereby dischargeable pursuant to 11 U.S.C. § 524(a) and the Discharge Order entered in Leader's chapter 7 case. *Order Discharging Debtor*, *In re Leader*, No. 22-01939-DSC7 (Bankr. N.D. Ala.), ECF No. 17.

Pursuant to Rule 7058 of the Federal Rules of Bankruptcy Procedure, this Court will enter a separate judgment in favor of the Defendant, Dean E. Leader, with costs taxed as paid.

Dated: November 27, 2023  /s/ D. Sims Crawford
D. SIMS CRAWFORD
United States Bankruptcy Judge